**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

AURELIA POWELL,

                Plaintiff,

vs.                                      Case No. 3:07-cv-361-J-32MCR

DUVAL COUNTY SCHOOL BOARD,

                Defendant.

_____

## ORDER[1]

      This Title VII case, in which plaintiff alleges employment discrimination, sexual harassment and retaliation, is before the Court on Defendant's Motion for Summary Judgment (Doc. 15), plaintiff's response (Doc. 18) and defendant's reply. (Doc. 21.) Additionally, the Court considers plaintiff's Motion to Strike (Doc. 22) and defendant's Motion To Strike as well as defendant's response to plaintiff's motion. (Docs. 24, 25.)

## I.    **Background**[2]

      Plaintiff Aurelia Powell began her career as an educator employed by defendant, the Duval County School Board ("School Board" or "District"), as an elementary school teacher in the fall of 1976. (Doc. 15-3 at 3, 11.) Powell taught at various elementary schools, and

---

    [1]   Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it is intended to decide the matters addressed herein and is not intended for official publication or to serve as precedent.

    [2] Consistent with summary judgment practice, the facts stated are either undisputed or are stated in a light most favorable to Plaintiff. See White v. Mercury Marine, 129 F.3d 1428, 1430 (11th Cir. 1997).

became a speech teacher in the 1989-1990 school year. During the 1980's while still a teacher, Powell first met assistant superintendent Levi McIntosh ("McIntosh"), and maintained a social and romantic relationship with him for a period of time. However, the relationship "stopped . . . for a while," and "was an off-and-on relationship." (Doc. 15-6 (Powell Dep. at 26-32).) In the 1995-1996 school year, Powell was appointed assistant principal of J.E.B. Stuart Middle School, where she had been teaching. (Doc. 15-3 at 3, 11; Doc. 15-6 (Powell Dep. at 13).) Powell held the position at J.E.B. Stuart through the 2001-2002 school year. She transferred to Williams Raines High School as an assistant principal on July 29, 2002. (Doc. 15-3 at 3-4, 11.)

During the years 2000 through 2002, when she was assigned to J.E.B. Stuart, Powell resumed a consensual sexual relationship with McIntosh, then a district regional superintendent. (Doc. 15-5 at 30; Doc. 15-6 (Powell Dep. at 35-36).)[3] During this time, Carol Daniels was principal of J.E.B. Stuart, and McIntosh was the regional superintendent over J.E.B. Stuart. McIntosh did not directly supervise Powell during this period, but he was in her chain of command. (Doc. 15-6 (Powell Dep. at 104).) McIntosh's office was located in a separate facility, the former Tech High School, and he would periodically visit the schools in his region, including J.E.B. Stuart. (Doc. 15-3 at 5.) According to Powell, during these visits, McIntosh would ask her why she would not see him or return his calls. (Doc. 15-6 (Powell Dep. at 106-08, 165).) Powell said that McIntosh had asked her for money "several

---

[3]    Five to ten years passed between Powell's intimate relationships with McIntosh. (Doc. 15-6 (Powell Dep. at 165).)

times" after she became an assistant principal. (Doc. 15-6 (Powell Dep. at 53, 55).)[4]

Prior to July 2002, while still an assistant principal at J.E.B. Stuart, Powell was screened and interviewed by a committee for the position of District principal, the only time she was ever screened for a principal position. McIntosh was a member of the interviewing committee. (Doc. 15-6 (Powell Dep. at 51, 58, 99-101, 117).) Just prior to the screening, McIntosh requested between $600 and $800 from Powell, the largest amount of money he ever requested. "I had gotten calls all that night, and the next morning of the screening, repeated calls and hanging up, repeated calls with him asking for the money. By the time for the screening, I was a nervous wreck. I refused to take his calls. . . . I did not intend to give him the money." (Id. at 56, 148-49 (he left messages on the answering machine).) At the screening committee meeting, McIntosh sat silent and "he sat there with this ugly look, with his arms folded." (Id. at 147.) After the screening, McIntosh went to Powell's home and asked for money, and Powell gave it to him. (Id. at 53, 57-58.) McIntosh told Powell that she had not passed the interview saying "[y]ou did terrible." (Id. at 58, 150-51.) "I was crushed. I . . . felt like I was harassed. I felt like I had been taken advantage of. I felt like he totally destroyed that interview process on purpose because I didn't return his calls or give him the money." (Id. at 58.) Powell ended the relationship after that event. "I would stop returning his phone calls." (Id. at 59, 118.) She said that she had felt "pressured" during the relationship and "felt that it would hurt me not to maintain a relationship with him." (Id. at 120, 126.)

---

[4] McIntosh also borrowed money from others in the District. (See Doc. 15-7 (Hite Dep. at 16-17); Doc. 15-6 (Powell Dep. at 168).)

3

While still at J.E.B. Stuart, Powell told her principal, Daniels, that McIntosh asked her for money. "[I]t was after a screening of some sort and I shared with her that I had some concerns. . . . I had some concerns that whenever I had a screening come up I started getting calls [for money]." (Doc. 15-6 (Powell Dep. at 49-52); see also Doc. 15-5 at 30.) While Powell told Daniels about the relationship with McIntosh, she did not relate any details, and she did not tell Daniels about any sexual harassment. (Doc. 15-6 (Powell Dep. at 48-52, 152-54, 168).)

Powell transferred to Raines in July 2002 at the behest of principal Daniels, who was transferred by the District to Raines as its principal. (Doc. 15-3 at 4; Doc. 15-6 (Powell Dep. at 65).) Daniels said she "hand-picked" Powell to serve as an assistant principal at Raines "[b]ecause she's a strong disciplinarian, and I needed consistency." (Doc. 15-4 (Daniels Dep. at 26).) According to Powell, Daniels verbally promised her a wage increase upon transferring to Raines. Powell conceded that Daniels did not specify an amount, but Powell's expectation was that it would be "substantial." (Doc. 15-6 (Powell Dep. at 65-67, 75-76).) Daniels said she did not have a conversation with Powell about additional compensation if she came to Raines. "I had a conversation with all of them [administrators and teachers] about the work and the volume of work and that there should be some additional compensation. Later, the district had . . . - as part of the state plan to provide incentives to employees in a challenged school." This conversation took place "fairly early in the assignment there." Any additional pay for being assigned to Raines would have been

pursuant to contract. (Doc. 15-4 (Daniels Dep. at 28-30, 48).)[5]  Daniels said that she assumed all who were eligible received all bonuses that were due "unless they told me they didn't, and then I went back to try to find out, research what happened." She said Powell never told her that she did not receive a bonus due to her for moving to Raines. (Id. at 50.)

McIntosh was the regional superintendent over Raines until July 12, 2004, when the District transferred Raines from McIntosh's region and created a new region of six challenged schools, to be headed by regional superintendent Steve Hite. (Docs. 15-3 at 5; 15-7 (Hite Dep. at 28).) According to the District, "[f]rom that point on (July 12, 2004), neither Carol Daniels nor Aurelia Powell were in Levi McIntosh [sic] chain of command, and hence were not subject to direction from him. This continued to be the situation throughout the remainder of Powell's employment by the District." (Doc. 15-3 at 5-6; see also Doc. 15-7 (Hite Dep. at 6, 28).) Powell remained at Raines through the end of the 2005-2006 school year. (Doc. 15-3 at 4; see also Doc. 15-6 (Powell Dep. at 18-19, 34).)

Powell said that after "over a year or two" at Raines, "sometime in 2005" she asked McIntosh about the promised raise. (Doc. 15-6 (Powell Dep. at 71).) She later conceded that the conversation with McIntosh about the raise would have occurred before Hite took over in 2004 as supervising regional superintendent of Raines. (Id. at 73-75.) "And [McIntosh's] comment to me was that if he had anything to do with it, I wouldn't get it." (Id. at 76.)

---

[5]  District Chief Human Resources Officer Vicki Reynolds states that "McIntosh did not have anything to do with determining Aurelia Powell's salary. That was determined by her position (Assistant Principal), her seniority, the step she was at and the District's budget for the school year in question. Salaries are set by Human Resources pursuant to established guidelines . . . ." (Doc. 15-3 at 6-7.)

While at Raines, Powell received four "step" raises. Additionally, Powell received four "challenge bonuses" provided for staff at challenged schools based on improvements in student performance. The raises and bonuses were consistent with administrators similarly situated. (Doc. 15-3 at 7, 11, 28-29.)

McIntosh subsequently contacted Powell about the possibility of renting her house to visitors to the Super Bowl, which was played in Jacksonville on February 6, 2005. However, no rental deal was made, and the house was not rented out. (Doc. 15-6 (Powell Dep. at 60-61, 166).) Powell was unclear on when McIntosh physically "harassed" her[6] and could not remember when Powell asked her for assistance in his buying a Jaguar automobile. (Id. at 77-79).) Powell never disclosed to Hite that she had been sexually harassed. (Doc. 15-7 (Hite Dep. at 18).)

In October 2005, the District initiated an investigation of a complaint by an elementary school principal relating to an intimate relationship she had with McIntosh, who was her supervisor as regional superintendent during the 2003-2004 school year. The principal complained "that when she attempted to end the relationship, that McIntosh threatened her with employment related issues," which McIntosh denied. (Doc. 15-5 at 3.) As part of the investigation, the District interviewed a number of witnesses, including Powell. (Doc. 15-5

_____

[6] Powell testified about McIntosh "rubbing up against" her and "grabbing the inner part" of her legs "I'm thinking that that must have been the visit at Raines High School. But he often visited when I was at Stuart as well, so . . . . Mainly what I got was the hands and phone calls and that type of situation. . . . Trying to get me to date him." Powell conceded she stopped McIntosh's conduct after the $800 incident. (Doc. 15-6 (Powell Dep. at 112-13).) She later testified that McIntosh never "touched her legs" in a school. (Id. at 151.)

at 3-4, 8-48.)  Powell was first interviewed on October 31, 2005.[7]  During the first interview,

Powell disclosed to the District for the first time that she had had an intimate relationship with

McIntosh for a two-year period during the time that she was assigned to J.E.B. Stuart.  (Id.

at 4, 30; Doc. 15-6 (Powell Dep. at 113).)  Josephine Jackson, director of the District's Office

of Equity and Inclusion, who investigated the complaint, reported that "Powell was very upset

and cried off and on throughout her first interview."  (Doc. 15-5 at 30.)

> She spoke of her 31 years of employment with the District and her attempts to become a principal.  She seemed to feel that something had happened in her past that was preventing her from moving forward with her career.  She spoke about a conversation with Steve Hite last summer during which he stated to her, "You have no idea what you've done, do you?"  Powell said she did not pursue the conversation, nor asked what Mr. Hite meant by his comment.[8]

(Id.)

Powell told Jackson that she and McIntosh had been friends for "many years" before

the relationship became intimate.  "She informed her current principal of the intimate

relationship" but had not informed the central District administration.  Powell told Jackson

that McIntosh had "repeatedly pressured her for money and said his requests seemed to

come whenever she was scheduled for a job screening that could potentially move her along

in her career."  She said she "frequently" gave McIntosh money for some time before their

relationship became physical, and that his requests for money continued during the 2000-

---

[7]  She was subsequently interviewed on November 10, 2005, and via telephone on January 10, 2006.   (Doc. 15-5 at 30.)

[8]  Powell testified that she has "no idea" what Hite was referring to when he made the comment.  (Doc. 15-6 (Powell Dep. at 123-24, 170-71.)

7

2002 period.  (Id.; see also Doc. 15-6 (Powell Dep. at 53 (McIntosh asked Powell for money "[s]everal times")).)  She spoke specifically about a "call" from McIntosh "before a screening for a principal position."  Jackson reported that Powell said:

> He asked for money and she refused to give it to him.  The next day, during the screening, [McIntosh] allegedly sat with his arms crossed "glaring"at her.   He later came to her house, and she gave him the money he requested ($800).   Powell was not offered the position.

(Doc. 15-5 at 30.)  Powell told the interviewer that the relationship ended when "she began to pull away from him and simply stopped returning his calls."  (Id. at 31.)  Jackson wrote in the 2005 report that Powell said she accepted the position at Raines "because she believed it would result in a pay raise" but that McIntosh told her "if he had anything to do with it, she would never get a raise."  (Id.)  Powell said she had no contact with McIntosh after the District's interview on October 31, 2005.  (Doc. 15-6 (Powell Dep. at 113-14).)

The District's investigation concluded on February 7, 2006, that there was evidence to establish that McIntosh violated state and District policies and procedures relating to sexual harassment and a hostile work environment.  (Doc. 15-5 at 8, 14, 47-48.)   "The Investigative Report concluded that McIntosh had been untruthful in denying he had sexual affairs" with the complaining principal and with Powell.  (Doc. 15-5 at 4.)  The district superintendent on February 16, 2006 issued a letter to McIntosh terminating his employment subject to any due process rights guaranteed to McIntosh under his annual contract and Florida law.  (Doc. 15-5 at 4.)  In order to avoid a hearing and possible appeal of the termination, the District agreed on February 21, 2006 to pay McIntosh's salary through the June 30, 2006 expiration of his contract in return for his resignation effective March 3, 3006

(and taking of annual leave from February 22, 2006 until the date of resignation). (Doc. 15-3 at 4-5, 20.)

On July 1, 2006, Powell requested that she be transferred from Raines to another school because of the publicity surrounding the McIntosh investigation. Powell was reassigned to Mandarin High School as an assistant principal starting with the 2006-2007 school year. Powell's salary was increased by $5,586, up to $72,149 upon being transferred to Mandarin, comparable to other assistant principals in the District. (Doc. 15-6 (Powell Dep. at 114-15, 131); Doc. 15-3 at 4, 8, 12; Doc. 21-3 at 2.)

On July 3, 2006, Powell submitted a Charge of Discrimination to the United States Equal Employment Opportunity Commission (EEOC) in which she alleged the following:

> 1. I was denied promotion to a position of Principal from my current position of Assistant Principal, and I was denied a wage increase of approximately $40,000.00 more than my current salary of $65,000.00 annually . . . as recently as October 13, 2005. . . .
>
> 2. Ms. Carol Daniels, Principal, at the direction of [the former superintendent], verbally promised me a wage increase; however, Dr. Levi McIntosh, former Regional Superintendent . . . , male, refused to allow the wage increase, and promotion, but he did not provide a reason for the refusal.
>
> 3. I believe the reason for the denial of a wage increase, and the denial of the promotion is because of my sex, female, and it was in retaliation for my refusal to continue a sexual relationship in violation of . . . Title VII of the 1964 Civil Rights Act, as amended.
>
> 4. I feel this way because after I discontinued having a consensual sexual relationship with Dr. McIntosh, then the promise of a wage increase, and promotion was denied. I am qualified for the position.

(Doc. 15-5 at 59.) Powell checked the form's box indicating that the alleged discrimination was based on "sex" and "retaliation," and alleged that the discrimination took place on October 13, 2005, as the earliest and latest dates, and was not continuing. (Id.)

On May 2, 2007,[9] Powell filed a two-count complaint against the School Board alleging unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and seeking damages. Powell alleged that during her employment, McIntosh sexually harassed her continuing "throughout the 2005 calendar year." (Doc. 1 at 2 (Compl. ¶ 6).) Plaintiff alleged that she complained to supervisors, and that the District took no action after becoming aware of McIntosh's harassment, and allowed McIntosh to continue to supervise Powell. (Compl. ¶ 8.) Powell alleged that McIntosh thwarted her application and interview for the position of principal "during the Fall of 2003."[10] (Compl. ¶¶ 9-13.) In Count I entitled "Unlawful Sexual Harassment, Sex Discrimination and Retaliation," Powell alleged that McIntosh's harassment affected the terms and conditions of her employment; that the harassment was by a supervisory employee; and that the District took no remedial action "despite Plaintiff having repeatedly complained about it." Powell alleged that she was not promoted and was transferred based upon her sex, and was retaliated against "based on Plaintiff having

_____

[9]  The EEOC issued a "right-to-sue" letter on February 22, 2007, finding that it was unable to reach a conclusion as to Powell's charges. (Doc. 15-5 at 62.) Powell's complaint was filed within the prescribed 90-day time.

[10]  As set forth above, the evidence established that Powell interviewed for the position of principal while she was assistant principal at J.E.B. Stuart Middle School, which was through the school year concluding 2002. The discrepancy between plaintiff's allegation and the evidence does not affect the Court's conclusion in this matter.

repeatedly complained of sexual harassment/discrimination." (Compl. ¶¶ 14-20.) In Count II, entitled "Sexual Discrimination," Powell alleged that the District "breached its duty to provide nondiscriminatory employment opportunities" when it did not promote her to principal and "forced" her to work under McIntosh's supervision and be evaluated by him. (Id. ¶¶ 21-23.)

In July 2007, for "the 2007-2008 school year, for budgetary reasons, Powell together with 3 other assistant principals at Mandarin High School, was reduced from being a 12-month employee to a 10-month employee. Her salary for the 10-month 2007-2008 school year was [reduced from $72,149 to ] $69,738, the highest amount for a 10-month Assistant Principal." (Doc. 15-3 at 8.) According to the District, Mandarin principal Crystal Sisler retained three of the school's seven assistant principals "with the greatest expertise and experience in curriculum and scheduling." The change was "administratively implemented" by principal Sisler. (Doc. 15-3 at 8.) On May 23, 2008, Powell sent a letter to Reynolds in which Powell said that she intended to terminate her employment with the District as of June 10, 2008. "The reason for my termination is Normal Service Retirement." (Doc. 15-3 at 14; see also Doc. 15-6 (Powell Dep. at 17).)

## II.    **Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute."

Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his or her case on which he bears the burden of proof at trial." Schechter v. Ga. State Univ., 2009 WL 2448254, at *1 (11th Cir. Aug. 12, 2009)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## III. Discussion

"Title VII prohibits sex-based discrimination that alters the terms and conditions of employment." Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1300 (11th Cir. 2007)(citing 42 U.S.C. § 2000e-2(a)(1)). "The forbidden alteration can be brought about in either of two ways. [Citation omitted.] One is through a tangible employment action, such as a pay decrease, demotion or termination. . . . The other way is through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." Id. (citing Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004)).

### A. Timeliness Of EEOC Complaint

The District has moved for summary judgment on Powell's Title VII claims on the

ground that Powell failed to timely exhaust her available administrative remedies. This also requires the Court to determine the scope of plaintiff's claims. "The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation." Alexander v. Fulton County, Ga., 207 F.3d 1303, 1332 (11th Cir. 2000), overruled on other grounds, 338 F.3d 1304 (11th Cir. 2003); 41 U.S.C. § 2000e-5. "No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." Alexander, 207 F.3d at 1332. "Plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. (internal quotation marks omitted). Although judicial claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC charge are permitted, the Eleventh Circuit has cautioned "that allegations of new acts of discrimination are inappropriate." Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004). A plaintiff's civil complaint remains "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. at 1280. Determination of whether plaintiff exhausted her administrative remedies with the EEOC is a legal determination for the Court. Id.

Powell complained to the EEOC of discrete acts of alleged discrimination - denial of a promotion to the position of principal, and denial of an alleged verbally promised pay increase - because of her sex, and in retaliation for her refusal to continue a sexual relationship with McIntosh. (Doc. 15-5 at 59.) Powell did not complain of "sexual harassment" or a "hostile work environment" in her EEOC papers, stating "after I

13

discontinued a consensual relationship with Dr. McIntosh, then the promise of a wage increase, and promotion was denied." (Id.) She specifically did *not* charge a "continuing action."[11] "The limitations period begins running the day the discrete act occurs." Chambliss v. Louisiana-Pacific Corp., 481 F.3d 1345, 1349 (11th Cir. 2007).

Because Florida is a deferral state (with a state agency equivalent to the EEOC), Powell was required to file a Charge of Discrimination within 300 days of the last discriminatory act alleged in order to timely exhaust her administrative remedies and bring suit on the basis of that action. E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002); Freytes-Torres v. City of Sanford, 270 F. App'x 885, 890 n.1 (11th Cir. 2008); 29 U.S.C. §§ 626(d), 633. Powell filed her EEOC charge on July 3, 2006. Thus, the discrete acts of alleged discrimination by the District must have occurred on or after September 5, 2005, in order for Powell's EEOC charge to be timely.

Even considered in the light most favorable to the plaintiff, the evidence does not establish any discriminatory conduct or retaliation as alleged in Powell's EEOC charge on or after September 5, 2005.[12] The only time that Powell was denied a principal position was

_____

[11]   Unlike discrete acts, "[a] hostile work environment claim depends on 'a series of separate acts that collectively constitute one "unlawful employment practice."'" Chambliss v. Louisiana-Pacific Corp., 481 F.3d 1345, 1349 n.1 (11th Cir. 2007)(quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002)); 42 U.S.C. § 2000e(1).

[12]   Plaintiff makes no claim that the recently enacted Fair Pay Act applies to her case. Inasmuch as Powell is not alleging a "discriminatory compensation decision," but rather is alleging sexual discrimination and retaliation by failure to promote or pay an allegedly promised wage increase, both discrete acts, this case does not appear to implicate the recently enacted legislation called the "Lily Ledbetter Fair Pay Act of 2009," Pub. L. No. 111-2, 123 Stat. 5 (2009)(amending 42 U.S.C. § 2000e-5(e)), signed into law by President Obama on January 29, 2009.

prior to July 2002, while she was assistant principal at J.E.B. Stuart Middle School. Powell has adduced no evidence that she applied for or was denied a principal position on any other date, including October 13, 2005, the date which she states the alleged discrimination occurred. Additionally, human resources chief Reynolds stated that she "examined the District's records relating to 16 separate principal screenings which occurred from March 10, 2005 [to] May 16, 2006, some involving multiple candidates and others just a few. Ms. Powell was not a candidate in any of these screenings." (Doc. 15-3 at 6.)

As to the alleged promised pay raise, Powell states that Daniels promised her an unspecified but "substantial" pay raise in connection with Powell's transferring to Raines in July 2002. Powell never complained to Daniels that she did not receive the pay raise and, according to Powell, complained to McIntosh while he was still her supervising regional superintendent, which would have been before July 2004. Asked about the October 13, 2005 date designated in her EEOC Charge as the date of the alleged discrimination, Powell responded: "The only thing I can think of is that must have been the date that I was told I wasn't going to get the pay. But I can't specifically tell you anything about October 13th . . . . I did speak with Dr. McIntosh about my money that I was promised for coming to that school, but I don't know if that's the date. . . . I can't remember what happened on October 13. . . . I can't be sure what October 13th was." (Doc. 15-6 (Powell Dep. at 38, 46).) Thus, Powell's reference in her EEOC complaint to a discrimination date of October 13, 2005 is not supported by any evidence, even considered in a light favorable to plaintiff.

Other alleged contacts with McIntosh pertaining to a Super Bowl house rental deal and purchase of an automobile are not relevant to the specific charges in Powell's EEOC

15

Charge of Discrimination. Nonetheless, Powell was unable to specify a time frame for these contacts, and what evidence there is suggests that they occurred before September 2005.

Powell, in response to the District's motion for summary judgment, argues that "[d]uring the calendar year of 2002, when Ms. Powell attempted to break off her relationship with Mr. McIntosh, he began a campaign of harassment and intimidation which continued until late 2005." (Doc. 18 at 2; see also id. at 8-9.) However, even under a broad interpretation of Powell's Charge of Discrimination, the EEOC's investigation of her charges could not reasonably have reached "a campaign of harassment and intimidation" through 2005 growing out of the alleged denial of a promotion and pay raise. The EEOC charge says nothing about McIntosh's requests for money, pressure, repeated overtures or continuing harassment; rather it states that "after I discontinued having a consensual sexual relationship" with McIntosh and "in retaliation for my refusal to continue a sexual relationship," McIntosh "refused to allow the wage increase and promotion." (Doc. 15-5 at 59.) See Gregory, 355 F.3d at 1279-80. Indeed, McIntosh ceased being in Powell's chain of command as of July 2004, and there is no evidence he went outside of that chain to exact the adverse employment actions alleged. Accordingly, Powell cannot satisfy the prerequisite of a timely filed administrative charge with the EEOC, see Davis v. Polk County Sheriff's Office, 170 F. App'x 598, 600 (11th Cir. 2005), and summary judgment is due to be entered in favor of the District on this basis.[13]

---

[13] Even if Powell's EEOC Charge of Discrimination could be construed to embrace continuing harassment and conduct that occurred through 2005, which would make it timely, (rather than the discrete events alleged, which render it untimely), and considering the evidence favorably for Powell that McIntosh did indeed sexually harass Powell and that the

harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment, see Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1199 (11th Cir. 2001), as plaintiff now attempts to frame her claim, (see Doc. 18 at 10-11), the undisputed evidence establishes that the District has met both elements of the vicarious liability affirmative defense spelled out in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Inds., Inc. v. Ellerth, 524 U.S. 742 (1998). The District has proffered undisputed evidence that "'(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296-97 (11th Cir. 2000)(quoting Faragher, 524 U.S. at 807).

At all relevant times, the District maintained a written anti-harassment and gender discrimination policy which had been disseminated to employees. (Doc. 15-5 at 4, 50-55.) The policy provides that complaints be filed with the District's Equity Officer within 60 days of the occurrence of harassment. (Id. at 53.) Having served as "Title 9 officer" at Raines, Powell would have been aware of these policies. (Doc. 15-4 (Daniels Dep. at 53-54).) It was incumbent upon Powell to use the procedure available to specifically address her problems and grievances concerning McIntosh. See Madray, 208 F.3d at 1298-99.

Further, the evidence establishes that the District did not actually know about McIntosh's alleged sexual harassment of Powell until October 31, 2005, when Powell first disclosed to District Equity Officer Jackson during the District's investigation of McIntosh, that she too had had a relationship with McIntosh, that McIntosh pressured her for money particularly in connection with job screenings, that she believed that her giving him money was tied to favorable or unfavorable treatment by him regarding her career, and that McIntosh had "glared" at her during her one and only principal screening. (Doc. 15-5 at 30.) Powell did not take any action to report McIntosh's conduct pursuant to the District's policies prior to that time. The evidence establishes that Powell did not put the District on actual notice of McIntosh's sexual harassment, and the District cannot be held liable on that ground. See Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1309-10 (11th Cir. 2007); Minix v. Jeld-Wen, Inc., 237 F. App'x 578, 582-83 (11th Cir. 2007), cert. denied, 128 S. Ct. 1231 (2008); Madray, 208 F.3d at 1300-01.

By October 2005 when she did report the behavior, Powell was no longer under the direct supervision of McIntosh and had no further contact with him. Within four months of this first notice, the District concluded its investigation and, in essence, fired McIntosh. Clearly, the District meets the second prong of the *Faragher-Ellerth* test. See Ellerth, 524 U.S. at 759; Nurse "BE", 490 F.3d at 1311-12; Minix, 237 F.App'x at 585.

**B.      Motions to  Strike**

Plaintiff Powell seeks to strike documents submitted by the District in a reply memorandum as well as references to the documents, which chronicle events that occurred after Powell transferred to Mandarin High School in July, 2006.  (Doc. 22.)  Powell contends that the documents should be stricken because the District did not produce them during discovery in response to Powell's request for production of documents.  (Id.)  Powell submitted a "Supplemental Affidavit" attaching documents which support her account of events while she was assistant principal at Mandarin.  (Doc. 23.)  The District seeks to strike Powell's motion to strike for not complying with Local Rules, and Powell's Supplemental Affidavit as an untimely and unauthorized supplement to plaintiff's response to the District's motion for summary judgment.  (Doc. 24.)  Alternatively, the District responds that it is submitting documents relevant to events at Mandarin because Powell "ambushed" the District by introducing, in her response to the District's motion for summary judgment, "relatively new, irrelevant materials into this case."  (Doc. 25 at 2.)  The District does not deny that it did not previously produce the documents during the course of discovery in this case.

The dispute in the motions to strike stems from the fact that Powell, in her response to the District's motion for summary judgment, argued that her retaliation claim is based upon an alleged "constructive discharge" from Mandarin High School in June 2008.  (Doc. 18 at 10-12.)  Given the state of the  pleadings, these matters are not properly before the Court.

Though subsequent retaliation claims based on the filing of the EEOC charge and the lawsuit need not have been reviewed by the EEOC, Baker v. Buckeye Cellulose Corp., 856

F.2d 167, 169 (11th Cir. 1988)(district court has ancillary jurisdiction over claim of retaliation that grows out of an administrative charge properly before the Court), Powell's complaint in this Court only alleges events which occurred before the May 2007 date of her complaint. (Doc. 1.)  Powell has never sought to amend her complaint to include allegations relating to events that occurred after she was assigned to Mandarin.[14]

The issues in this case are, of course, framed by plaintiff's complaint.  See Davis v. Coca-Cola Bottling Co. Consolidated, 516 F.3d 955, 979 (11th Cir. 2008).  "[A] party cannot amend her complaint to add a new claim through argument in a brief opposing summary judgment."  Champ v. Calhoun County Emergency Mgmt. Agency, 226 F. App'x 908, 912 n.3 (11th Cir. 2007)(citing Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004)); see also Austin v. City of Montgomery, 196 F. App'x 747, 753 (11th Cir. 2006)(plaintiff cannot amend her complaint to add a claim of constructive discharge through argument in a brief opposing summary judgment)(citing Gilmore, supra).  Plaintiff has not moved to amend her complaint, Fed. R. Civ. P. 15(a) or to supplement her pleading to set out events which occurred subsequent to the May 2, 2007 date of her complaint.  Fed. R. Civ. P. 15(d).  See Thompkins v. Lil's Joe Records, Inc., 476 F.3d 1294, 1310 (11th Cir. 2007)(proper procedure is to seek leave to amend complaint to add a claim).  If she had, Powell would be challenged to demonstrate "good cause" for the "extreme untimeliness" of any motion to amend the complaint filed after the close of discovery (See Doc. 6) and after the District's filing of its motion for summary judgment.  See Smith v. Sch. Bd. of Orange

_____

[14]    Powell agreed that nothing in her complaint refers to events that took place at Mandarin.  (Doc. 15-6 (Powell Dep. at 133).)

County, 487 F.3d 1361, 1367-68 (11th Cir. 2007); see also Lamothe v. Bal Harbour 101 Condo. Ass'n Inc., 316 F. App'x 844, 846-47 (11th Cir. 2008)(denying untimely motion for leave to amend to add constructive discharge claim to complaint alleging Title VII discrimination for lack of showing of good cause).

Because the issue of alleged constructive discharge from Mandarin High School is not properly before the Court and this Court cannot properly consider this claim, the motions to strike are due to be granted.

For the foregoing reasons, it is hereby

**ORDERED**:

1.      Defendant's Motion For Summary Judgment (Doc. 15) is **GRANTED**.  The Clerk shall enter judgment in favor of defendant and against plaintiff.

2.      Plaintiff's Motion To Strike (Doc. 22) is **GRANTED**.

3.      Defendant's Motion To Strike (Doc. 24) is **GRANTED** as to Plaintiff's Supplemental Affidavit and attachments.  (Doc. 23.)

4.      The Clerk shall close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 28th day of September, 2009.


TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record